BREAUX, J.
The action is petitory. Plaintiffs seek to recover from the defendants a tract of land containing (151.54 acres, for which they hold a patent, issued to Hiram Ours, or his heirs, dated the 12th day of April, 1902.
This tract lies between the Rio Hondo and Sabine rivers, in Calcasieu parish. It is well known as one of the Rio Hondo claims, and under that name it is referred to in the different land departments of the local and general governments.
Plaintiffs trace them claim of transfers back to the 1st day of November, 1824, at which time Hiram Ours located this tract as a Rio Hondo claim in accordance with an act of Congress.
Defendants meet plaintiffs’ demand for this land by tracing their title to the common author, Hiram Ours; by tracing the title further back — that is, from Hiram Ours, to the general government, the grantor; and, returning to the Hiram Ours’ grant in 1S24, they claim that after he (Hiram Ours) became the owner in 1824, he sold the land to Rees Perkins, and that they (defendants) are the owners of the title which Hiram Ours thus transferred to Rees Perkins.
In following up the history of the title, we find that Rebecca Carter at one time was in possession of a tract of land on which she had improvements. These she sold to Hiram Ours, her son, on the 1st day of March, 1823, and on the same sheet of papelón which this sale was written, about two years thereafter, the party Hiram Ours found space enough to write another deed, in which he (Hiram Ours) sold the improvements to Rees Perkins, whom the vendor expressly indicated in the deed as the one to whom the patent' should issue by the government.
For some reason not made evident by the record the name of Rebecca Carter as one in possession, or who had been in possession, is not mentioned in the proceeding of entry of the land by Hiram Ours, although she made the transfer as before mentioned. She in all probability had acquired no right of entry under the Spanish government, although she owned the improvements on the land.
Under the instructions of Gayoso, Governor of Louisiana, under the Spanish rule in the year 1797, there is no room to infer that women could become settlers and owners by occupancy in their own right. The male settlers could acquire a right to land from the government after having cultivated four crops thereon. This may account for the absence in the entry proceedings of all mention of any right having been acquired from Hiram Ours. American State Papers, vol. 5, p. 730.
The territory between the Rio Hondo and the Sabine, in which this land is situated, was debatable land between Louisiana and Texas. The authors of Hiram Ours managed to secure a settlement right under the Spanish government of Louisiana, which was afterward confirmed.
The “neutral territory” was scarcely neutral. The condition of neutrality indicated by the words “neutral territory” scarcely existed, as there was contention between the settlers of different allegiance.
It does not appear that Rebecca Carter acquired any rights under the government of Spain, in Texas, which may have been different from the instructions of Gayoso. Whatever right she had must have been merged in with those of Jordan Parkins into the possession and ownership of Hiram Ours, who, it appears to us, did not care .to win his mother’s rights because not sanctioned by the instructions before mentioned, but *217 made the entry as successor to all the rights •of Jordan Parkins.
In 1S19, the long controversy between the United States and Spain in regard to the Texas boundary was terminated by the treaty, and the Sabine became the boundary line. In this treaty it was provided that the United States would recognize the rights of settlers acquired prior to the year 1818, under the Spanish domination, in the disputed territory between the Hondo and the Sabine.
In order to carry out the treaty stipulations contained in the treaty before mentioned, the United States adopted an act providing for the examination of the titles to lands in that part of Louisiana which since the treaty was unquestionably to be considered as within the limits of the state of Louisiana. The neutral territory was by the act attached to the district south of Eed river, and the register and the receiver of the land office in that district were required to receive and record all written evidence of claim to land in that territory.
They were directed to return an abstract of each title, and to classify each, and to number them. The first three were to be confirmed, and the last, the fourth, rejected.
Hiram Ours appeared before the register and receiver of this district. They numbered his claim 271, located this land on Bayou Dinde — i. e., Turkey Bayou — and, after having heard his witnesses, noted the extent of his occupation and cultivation, as in other similar cases mentioned that he held through a chain of transfers from Jordan Parkins.
After having gone through the required formalities, they stated that his claim fell within class 3, and recommended its confirmation.
American State Papers, vol. 4, p. 74.
In the year 1825 Hiram Ours sold his improvements on the land to Eees Perkins, and in the event that, as a settler, the improvement remained to him, he directed that patent issue in the name of Eees Perkins.
Eeturning for a moment to the act of the general government, we find that this land designated as having been No. 271 has been surveyed at least three times, and by the authorized surveyors of the government, on the record of the Land Department, and that these surveys appear to have been approved.
The title has been repeatedly recognized as being in Hiram Ours’ name, and as having passed out of the government. The confirmation was complete, and the grantee acquired every right to land x>ossible under the land laws. There was no necessity of a patent to issue in order to segregate the land any further than it was from the public domain.
After the grantee had become the undisputed owner of the land, Eees Perkins, who had bought'his (Hiram Ours’) improvements, and who was designated in the deed of sale of these improvements as the one to whom patent should issue, assumed to sell by authentic deed — whether rightly or wrongly it is difficult to decide after these many years —this very land to John Stine (this was in the year 1837, and the sale is unquestionable at this time; it is in authentic form), and conveyed the property absolutely to Stine.
Stine, in turn, by authentic deed, in the year I860, sold to Leon Verdun.
At the death of the latter, the property constituted assets of his succession, and it was as such sold to his children, Adeline and Tjieodore Verdun. They sold it in the year 1869 to Dr. Euben P. Gray, who went into possession under his recorded deed. The chain of transfers is complete at least as far back as the sale of Eees Perkins to Stine.
The respective owners went into possession, improved the land, and exercised all the rights of owners.
The land was not only located, as appears by certificate of entry dated December 15, *219 1852; the certificate further sets forth that the law of Congress did not authorize the issuance of a patent for claims such as these, and that, in consequence, the certificate was issued as the final title of grantee.
Considered in the light most favorable to plaintiff, the certificate, as evidence, was of equal dignity with a final receiver’s receipt, and such a receipt, when legally issued, has always been considered as evidence sufficient to establish that the land is segregated from the public domain without the necessity of obtaining a patent to show that fact. It is not because the patent was issued in the year 1902 in the name of the settler before named, Hiram Ours, that the government must be considered to have been the owner to the date of the patent.
The following is sustained by precedents:
“Once a tract of land has been granted by the government, it is segregated from the body of such lands, and is no longer subject to any other disposition by the government, either directly or under the general land laws,, unless the grant is set aside and annulled in due course, or is absolutely void; and no conditions or limitations to be super-added, unless power to do so is reserved.” Am. & Eng. Enc. of Law, vol. 26, p. 219.
The patents are issued in the name of the settler, and the Land Department, in issuing them, does not stop to inquire if others than settlers, by whom proof of possession and settlement is made, own the right at the time the patents issue. The rights which others than the settlers may acquire on the land from the date of final proof to the date the patent issues are left to be determined among the parties. After the government has parted with the land through its Land Department which has declared favorable to a settler’s application, the land falls into commerce, and it becomes subject of taxation. It can be disposed of, and, in the course of time, the patent issues without disturbing the acquired rights of others than actual settlers. The patent is evidence of settlement,, and does not in any manner interfere with any valid adverse right to the land. Section 2447, Rev. St. U. S. [U. S. Comp. St. 1901, p. 1512],
The settler parted with his improvements after he had made settlement and indicated that the purchaser of the improvements should have the patent, after these many years, and after the years of silence of the settler, it is to be taken as evidence that the transferee of the settler had the right to transfer the land.
If, as contended by plaintiff, the certificate of the register, dated 15th December, 1852, is meaningless in stating that it issued as final title, then the patent would have to be considered as the date at which the government made the grant.
We cannot agree with that view. The certificate is fully sustained by required proof, return to the government, and confirmation of title as just stated; also by location of the land apd. required government survey..
We. are brought to'a consideration- oí the plea of prescription, which serves no great purpose, although well pleaded, £p'r Veal'ly '$ occurs to us that the title is complete, correct,.'ahd legal, without ‘‘the prescription invoked by defendant. .'
St.ine, one^of the authors of defendant, acquired' the ¡propel'ty.r.over ,30. years ago by authentic act, and over 30 year's ago he -transferred'the$>roperty by .gh act similar in form. The‘last purchaser has been in possession over 10 years, has improved the property, and his title was in every respect one translative of property which he received in good faith. The case of Jopling v. Chachere, 107 La. 533, 32 South. 243, which has met with the complete approval of the Supreme Court of the United States (24 Sup. Ct. 214, 48 L. Ed. —), is very similar; also the Gonsoulin Case, 116 Fed. 251, 53 C. C. A. 31, recently decided.
We adhere to these decisions, and in ad *221 hering t« them we conclude that plaintiff has not made out a ease.
Eor reasons assigned, the judgment must be affirmed. It is affirmed.